**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:15-CR-10-GNS**

UNITED STATES OF AMERICA,                                          **Plaintiff,**

v.

MARC THOMPSON,                                                    **Defendant.**

**REPORT AND RECOMMENDATION**

Before the Court by order of reference is defendant ("Defendant") Marc Thompson's

Motion to Suppress evidence obtained during a traffic stop.[1]  The United States (the

"Government") has filed a response,[2] and the Court held a hearing on the motion on November

2, 2015.  Following the hearing, both parties simultaneously submitted post-trial briefs.[3]  For the

reasons stated below, it is recommended that the Motion to Suppress be denied.

I.      **Proposed Findings of Fact**

At the suppression hearing, the Government called as witnesses Louisville Metro Police

Department ("LMPD") Detectives Brett Hankison, Christopher Lott, and Jason DeWitt

(collectively "the Officers").  The Court received as evidence the Officers' digital audio

recordings of the traffic stop and Thompson's arrest/traffic citation.  Defendant did not testify at

the hearing.  The Court, having fully considered the evidence presented at the hearing, finds the

Officers' testimony to be credible.  As there is no contradictory evidence, the Court therefore

adopts the Officers' account of the events as its findings of fact.

---

[1] DN 20.
[2] DN 21.
[3] DNs 36 & 37.

1

Around 9:15 PM on the night of July 11, 2014, the Officers were heading southbound on Shepherdsville Road in an unmarked LMPD vehicle.[4]  DeWitt was driving the vehicle when a silver Dodge Charger passed them at a high rate of speed in the left lane.[5]  The Charger erratically changed lanes without using a turn signal and then immediately locked up its brakes and turned—also without signaling—into a parking lot on the 5300 block of Shepherdsville Road.[6]  The Charger's actions caused the car to behind it to "hit its brakes very hard to avoid striking" the Charger, which in turn caused DeWitt to hit his brakes in order to avoid hitting the other car.[7]

The Officers followed the Charger into the parking lot, where they observed it pull into a parking space.[8]  At this time, DeWitt initiated his lights and siren and Hankison, who had been sitting in the front passenger seat, exited the vehicle.[9]  DeWitt also exited and walked straight to the driver's side door of the Charger,[10] while Hankison began to approach its passenger side.[11]  Lott exited and took a cover position behind the police vehicle.[12]  As he approached the Charger, Hankison shined his flashlight through the rear window and noticed the driver reaching over the center console and reaching under the passenger seat.[13]  Upon this observation, Hankison announced to the other officers that the driver was "stuffing," which is a term they use to describe someone's attempt "to hide or conceal some type of contraband."[14]  According to

---

[4] Motion to Suppress Hearing Transcript, 5 (hereinafter "Transcript").
[5] *Id.* at 7.  Hankison testified that the Officers were traveling at around forty-five miles per hour, the posted speed. *Id.* at 33.  Although the Officers did not record the Charger's speed, they could tell it was speeding because it rapidly passed their vehicle, which was traveling at the speed limit.  *See id.*
[6] *Id.* at 7.
[7] *Id.*
[8] *Id.* at 8.
[9] *Id.*
[10] *Id.* at 57.
[11] *Id.* at 9.
[12] *Id.* at 42.
[13] *Id.* at 10.
[14] *Id.* at 10-11.

Hankison, this occurrence caused the stop to go from "basically a traffic violation" to "a high risk stop at that time where we were instantly on alert."[15]

DeWitt reached the driver's door of the Charger and observed a man in the driver's seat, who was later identified as Defendant.[16] DeWitt asked him to step out of the car and step to the back of the Charger.[17] He then asked Defendant for consent to search his person and the car, and according to DeWitt, Defendant agreed.[18] While searching Defendant's person, DeWitt located his identification and handed it to Lott.[19] DeWitt then searched under the front passenger's seat and found a loaded .357 magnum revolver.[20] From the time the stop was initiated until the time DeWitt located the revolver, two to five minutes had passed.[21] At this time, Defendant was placed under arrest and was *Mirandized*.[22]

While DeWitt was interacting with Defendant, Hankison interacted with the passenger, who later turned out to be Defendant's wife.[23] Due to the fact that he had observed the driver "stuffing" something under the passenger seat, Hankison initially adopted an aggressive tone and ordered Mrs. Thompson to put her hands up and exit the vehicle.[24] During the questioning that ensued, Mrs. Thompson informed Hankison that there was a gun in the car.[25] The record, however, shows that by the time Mrs. Thompson made this statement, DeWitt had already

---

[15] *Id.* at 11.
[16] *Id.* at 57.
[17] *Id.* at 58.
[18] *Id.*
[19] *Id.*
[20] *Id.* at 62. DeWitt testified that at the time of the hearing, he could not specifically remember Hankison shouting that Defendant was "stuffing." *Id.* at 58. However, DeWitt is certain that during the events of July 11, 2014, he heard Hankison make this announcement. This is evinced by that fact that the first place DeWitt searched in the vehicle was under the front passenger seat, rather than the driver's side, which is where he normally begins a vehicle search. *Id.* at 62-63.
[21] *Id.* at 63.
[22] *Id.*
[23] *Id.* at 17.
[24] *Id.* at 16.
[25] *Id.* at 18.

located the revolver.[26]  At this time Mrs. Thompson was placed in handcuffs and was "detained" but not "arrested."[27]

Upon receiving Defendant's identification from DeWitt, Lott retrieved the Officers' laptop and ran a criminal check on Defendant.[28]  From this check, the Officers learned that Defendant was a convicted felon.[29]  For this reason, Defendant was indicted as a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1) and 18 U.S.C. 924(a)(2).[30]

In his Motion to Suppress, Defendant argues that the Officers violated his Fourth Amendment rights and that the Government should not be allowed to admit his revolver into evidence at trial because the Officers lacked consent, reasonable suspicion, or probable cause to search his vehicle.  Furthermore, he contends that the evidence should be suppressed because the initial traffic stop ripened into an unconstitutional seizure because it lasted forty minutes.

## II.  <u>Proposed Conclusions of Law</u>

### A.  <u>Consent to Search</u>

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV. This Court's analysis begins "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One of these exceptions is "consented-to searches," and officers "with consent need[] neither a warrant nor probable cause to conduct a constitutional search."  *United States v.*

---

[26] *Id.* at 18-19, 37-38.
[27] *Id.* at 19.
[28] *Id.* at 45.
[29] *Id.* at 46.
[30] DN 1.

*Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219

(1973)).  "Such consent, however, must be voluntary and freely given."  *United States v. Moon*,

513 F.3d 527, 537 (6th Cir. 2008) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49

(1968).  "Consent is voluntary when it is 'unequivocal, specific, and intelligently given,

uncontaminated by any duress or coercion.'"  *Id.* (quoting *United States v. McCaleb*, 552 F.2d

717, 721 (6th Cir. 1977)).  The government has the burden of proving, by a preponderance of the

evidence, that consent to a search was voluntary through "clear and positive testimony."  *Id.*

(quoting *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978)).  "Whether the consent

was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is a

'question of fact to be determined from the totality of all the circumstances.'"  *United States v.

Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 227).

　　With these principles in mind, the Court finds that Defendant's consent to search his car

was given knowingly, voluntarily, and intelligently.  Detective DeWitt repeatedly testified that

he obtained Defendant's oral consent to search the car.[31]  As Defendant did not take the stand,

there is no evidence that contradicts DeWitt's assertion.  Moreover, the Court found DeWitt to

be a credible and candid witness.  Specifically, DeWitt's admission on direct examination that he

did not presently remember having heard Hankison shout that Defendant was "stuffing"

bolstered his credibility in the eyes of the Court.  Despite this evidence that he consented to the

search, Defendant raises three arguments in an attempt to show that he did not consent.

　　First, Defendant contends that the Government has not met its burden because the

Officers did not obtain his written consent.  Although written consent would be better evidence

than an assertion that consent was orally given, the Constitution does not require a writing to

show that a defendant consented.  Second, Defendant seeks to undercut DeWitt's credibility by

---

[31] Transcript at 57-60.

pointing out that neither Hankison nor Lott heard Defendant give consent.  Again, corroborating evidence would certainly make things easier for the Government, but the fact that the other two officers did not hear the oral consent is not the same thing as if they heard an *express refusal of consent*.  Hankison and Lott were occupied with other tasks and, given Hankison's announcement that Defendant was "stuffing," it is understandable if their attention was focused on things other than the interaction between DeWitt and Defendant.

Third, Defendant contends that the Government has not met its burden because none of the audio recordings that the three Officers made captured Defendant's oral consent.  Again, an audio recording would certainly be better evidence that consent was voluntarily given, but such recordings are not required.  The consent exception predates the era of audio and video recordings, and courts found that consent was given long before this technology existed.  To be clear, DeWitt and Lott forgot to activate their recorders until mid-way through the stop, and Hankison is the only officer who recorded the entire stop.  A review of his recording, however, reveals that *none* of DeWitt's conversation with Defendant was captured by Hankison's recorder.  Because Hankison's recorder did not record any part of DeWitt's conversation with Defendant prior to the gun being found, it is not surprising that Hankison's recorder did not capture Defendant's verbal consent.

DeWitt's testimony that consent was given was credible and there is no contradictory evidence.  Therefore, the Court finds that the consent exception to the warrant requirement applies in this case and that the Officers' search of Defendant's car was reasonable.  However, even if consent was not voluntarily given, DeWitt's search of Defendant's car was still reasonable because the Officers' had reasonable suspicion of criminal activity.

B.  **Reasonable Suspicion of Criminal Activity**

Another exception to the warrant requirement is when police have reasonable suspicion that criminal activity is afoot.  "In such circumstances, the officer may conduct a brief traffic stop for investigative purposes and make reasonable inquiries to confirm or dispel his suspicions."  *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008) (citing *United States v. Butler*, 223 F.3d 368, 373 (6th Cir. 2000)).  "Reasonable suspicion requires more than a mere hunch, but is satisfied by the likelihood of criminal activity less than probable cause . . . . If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop."  *Id.* at 370-71 (citations omitted) (internal quotation marks omitted).  The lawfulness of these stops "is judged by the totality of the circumstances to 'determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'"  *Id.* at 371 (quoting *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006)).  Furthermore, police are allowed "to draw on their own experience and specialized training to make inferences from and deductions about cumulative information available to them that might well elude an untrained person."  *Id.* (citing *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008)).

The Supreme Court has also noted that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers."  *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).  In these situations, "police may order persons out of an automobile during a stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous."  *Id.* at 1047-48 (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977)).  If they possess reasonable suspicion that a suspect's automobile contains readily

7

accessible weapons, the police may also search "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden . . . ." *Id.* at 1049. Based on these considerations, the Court finds that even if the Officers did not have consent to search Defendant's Charger, their search was still permissible because they had reasonable suspicion that the vehicle contained a weapon.

The Officers' initial stop of the Charger was justified because they had probable cause that the driver was committing a traffic violation. *United States v. Noble*, 762 F.3d 509, 518 (6th Cir. 2014). The Charger's speeding, changing of lanes without signaling, cutting off another car, and turning into the parking lot without signaling easily met this standard. Ky. Rev. Stat. § 189.290. As discussed above, Hankison saw Defendant "stuffing" something under the front passenger seat. In the Officers' experience, when they observe someone stuffing during a traffic stop, the occupant is usually trying to conceal some type of contraband.[32] Viewed in isolation, a driver reaching under the front passenger seat is a purely legal activity. However, given the fact that this activity occurred during a traffic stop, coupled with the Officers' specialized knowledge that this activity during a traffic stop is usually a sign that the driver is attempting to conceal contraband, the Court finds that the Officers had the reasonable suspicion needed to justify a limited search of the Charger. This finding is in line with the case law, which instructs that such "furtive gestures" may be enough to establish reasonable suspicion.

In *United States v. Martinez-Cortez*, the police were executing a warrant at a residence. 566 F.3d 767, 769 (8th Cir. 2009). While the police were approaching the residence, a vehicle began to back out of the driveway, and the police ordered the occupants to put the vehicle in park and show their hands. *Id.* The occupants did not immediately comply with the orders, but instead, the driver "moved his arms as if to hide something between his leg and the car's

---

[32] *Id.* at 10-11.

console." *Id.* at 771.  When the occupants finally complied, the officers ordered them out of the vehicle and searched the area near the center console, finding baggies of methamphetamine.  *Id.* at 769.  Finding that the police had reasonable suspicion to search the vehicle, the Eight Circuit said that the driver's "furtive actions gave the officers reason to suspect, indeed, probable cause to believe that criminal activity was afoot, and that the occupants might be a risk to officer safety unless detained while the warrant search was completed."  *Id.* at 771.

Likewise, in *United States v. Morgan*, the court found that a driver's furtive gestures during police approach were enough to constitute reasonable suspicion.  729 F.3d 1086, 1090 (8th Cir. 2013).  There, officers were patrolling a grocery store when they noticed that occupants of a vehicle with tinted windows were attempting to conceal themselves.  *Id.*  When the officers approached, the driver made furtive gestures under his seat and refused to remove his hands from under the seat when ordered to do so.  *Id.*  The officers then searched under the seat and found methamphetamine.  *Id.*  Ruling that this search was constitutional, the court held that the driver's "furtive gestures under his seat as the officers approached the vehicle gave them reason to believe that there was a weapon in the vehicle . . . ."  *Id.*

Although in a slightly different factual context, the Sixth Circuit has also applied these principles to find that furtive gestures can give rise to reasonable suspicion.  *See United States v. Caruthers*, 458 F.3d 459, 466-67 (6th Cir. 2006) (discussing how the defendants' hunching down, leaning towards the ground, and attempting to conceal something after the police gave chase contributed to the officer's suspicions).  Because Defendant's actions in this case closely mirrored the drivers' actions in *Martinez-Cortez* and *Morgan*, the Court finds that they were enough to give the Officers reasonable suspicion that a weapon was located in the Charger.

9

### C. **Duration of the Traffic Stop**

Finally, the Court is unconvinced by Defendant's contention that the traffic stop was unconstitutional because it lasted an unreasonably long time, namely forty minutes. "'The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.'" *Noble*, 762 F.3d at 519 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). For this reason, when "'a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment.'" *Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 251 (2007)). At such traffic stops, as with *Terry* stops, the officer's inquiry must be "'reasonably related in scope to the justification for their initiation.'" *Id.* (quoting *Brignoni-Ponce*, 422 U.S. at 881). If the stop lasts longer than is necessary to carry out the purpose of the stop, "it may become an arrest that must be supported by probable cause." *Campbell*, 549 F.3d at 372 (citing *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008); *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007)).

The problem with Defendant's argument, however, is that the reason his stop lasted forty minutes is because the Officers continually developed new information during the traffic stop, information that first gave rise to reasonable suspicion, which then gave rise to the probable cause necessary to support an arrest. While approaching the Charger, the Officers first developed reasonable suspicion that he was armed and dangerous. Then, once DeWitt conducted his limited search of the vehicle and found the handgun, the Officers ran a search of Defendant's criminal history and developed probable cause that he was a felon in possession of a firearm. Because these occurrences were "during the traffic stop," not after "the purposes of the traffic stop were completed," the additional duration was justified. *See United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Once the purposes of the initial traffic stop were completed, there is

no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.").

Defendant makes much of the fact that after the Officers located Defendant's illegal gun, Hankison spent the greater portion of the ensuing forty minutes conversing with Mrs. Thompson about University of Louisville basketball, his dog, her blood sugar tester, where she got her purse, the Cincinnati Reds, the mileage on her car, where she ate dinner, her anxiety, how much she owes on her car, and her auto financing.[33]  Defendant contends that such conversation was unnecessary and unconstitutionally prolonged Defendant's seizure.  This contention, however, ignores the fact that while Hankison and Mrs. Thompson were conversing, Lott was running the criminal history check and DeWitt was processing Defendant.  Therefore, the time Hankison spent conversing ran concurrently with the investigation and booking, not on top of that time.  For these reasons, the Court finds that Defendant's seizure did not last unconstitutionally long.

### III.   Conclusion

For these reasons, the Court recommends that Defendant Marc Thompson's Motion to Suppress be DENIED.

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, any party may serve and file specific written objections to these findings and recommendations.  *Id.*; Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *United*

---

[33] *Id.* at 27-28.

*States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy of the objections.  Fed. R. Civ. P. 72(b)(2).

cc:  Counsel of record